Mackenzie FANDREY, a minor, by James B. Connell, her Guardian ad Litem, Plaintiff-Appellant,

WISCONSIN PHYSICIANS SERVICE INSURANCE CORPORATION, Plaintiff,

v.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, Defendant-Third-Party Plaintiff-Respondent,

v.

Michelle M. EGNER, Third-Party Defendant.

Supreme Court

*No. 02–2628. Oral argument November 4, 2003.—Decided June 3, 2004.*

2004 WI 62

(Also reported in 680 N.W.2d 345.)

50

BRADLEY, J., concurs.
ABRAHAMSON, C.J., joins.

For plaintiff-appellant there were briefs (in the court of appeals) by *James B. Connell* and *Crooks, Low & Connell, S.C.,* Wausau, and oral argument by *James B. Connell.*

For the defendant-third-party plaintiff-respondent there was a brief by *John A. Kramer, Michael J. Roman* and *Zalewski, Klinner & Kramer, LLP,* Wausau, and oral argument by *John A. Kramer.*

51

¶ 1. JON P. WILCOX, J. This case involves two questions certified to us by the court of appeals. First, the court of appeals has asked us to determine whether a court may use traditional public policy factors[1] to limit liability under Wis. Stat. § 174.02 (1999–2000),[2] commonly known as the "dog bite statute," when liability under the statute is otherwise established.[3] Second, if we determine that liability under § 174.02 may be precluded based on public policy factors, the court of appeals has asked us whether the Marathon County Circuit Court, Patrick M. Brady, Judge, properly applied those factors to limit liability in this case. We hold that a court may preclude liability under § 174.02 based on public policy factors and that the circuit court correctly applied those factors in granting summary

[1] In *Colla v. Mandella,* 1 Wis. 2d 594, 598–99, 85 N.W.2d 345 (1957) this court first articulated the following six public policy factors that could be used by courts to limit liability in negligence claims: 1) "[T]he injury is too remote from the negligence"; 2) Recovery is "too 'wholly out of proportion to the culpability of the negligent tort-feasor' "; 3) "[I]n retrospect it appears too highly extraordinary that the negligence should have brought about the harm"; 4) Allowing recovery "would place too unreasonable a burden upon [the tortfeasor]"; 5) Allowing recovery would be "too likely to open the way to fraudulent claims"; or 6) Allowing recovery "would 'enter a field that has no sensible or just stopping point.' "

[2] All subsequent references to the Wisconsin Statutes are to the 1999–2000 version, unless otherwise indicated.

[3] Section 174.02(1) provides, in pertinent part:

(1) Liability for injury. (a) *Without notice.* Subject to s. 895.045 [comparative negligence] and except as provided in s. 895.57(4) [immunity for damage due to unauthorized release of animals], the owner of a dog is liable for the full amount of damages caused by the dog injuring or causing injury to a person, domestic animal or property.

52

judgment in the case before us. Therefore, we affirm the decision of the circuit court, which granted American Family Mutual Insurance Company's motion for summary judgment.

## I. FACTUAL BACKGROUND

¶ 2. This case comes before us following a grant of summary judgment in favor of American Family Mutual Insurance Company (American Family). The operative facts are straightforward and undisputed, as the plaintiff, Mackenzie Fandrey (Mackenzie), did not submit any competing summary judgment materials.

¶ 3. On December 23, 2000, Michelle Rausch (formerly known as Michelle Egner) and her three-year-old daughter, Mackenzie, drove to the home of Nicole Beliunas (formerly known as Nicole Patton) to deliver Christmas cookies. Michelle and Nicole had been best friends for a number of years and frequently visited each other. On the day in question, the Beliunases did not invite Michelle over, and Michelle had not called ahead to determine if the Beliunases were home. Upon reaching the Beliunases' home, Michelle knocked on the back door, opened it, stepped inside, and called out. No one answered. Apparently, the Beliunases were at a movie and had left their door unlocked. Michelle proceeded to place the cookies on the kitchen table, which was a short distance from the door. She then put Mackenzie on a chair. While Michelle was writing a note to Nicole, Mackenzie, unbeknownst to Michelle, left the chair and proceeded into the Beliunases' living room. Michelle subsequently heard Mackenzie scream and turned to see Mackenzie bleeding from the mouth and standing near the Beliunases' dog, Molly.

## II. PROCEDURAL POSTURE

¶ 4. Mackenzie, by her guardian ad litem, brought suit against the Beliunases' insurer, American Family, alleging a cause of action under § 174.02. American Family answered, arguing as an affirmative defense that Mackenzie was a trespasser in the Beliunases' home and that the claim should be precluded based on public policy. American Family also filed a third-party complaint against Michelle, seeking contribution and indemnification due to Michelle's alleged negligent supervision of Mackenzie. Additional facts are set forth below in the opinion.

¶ 5. The circuit court found that Michelle and Mackenzie did not have implied consent to enter the Beliunases' house. It also found that Michelle knew the Beliunases kept Molly in their house. The court, relying on *Alwin v. State Farm Fire & Casualty Co.,* 2000 WI App 92, 234 Wis. 2d 441, 610 N.W.2d 218, then found that public policy precluded Mackenzie's claim under § 174.02. The court stated:

> I don't know what else they could have done as responsible dog owners that would be any more restrictive than to keep the dog inside their home. . . . [S]trict liability under Section 174.02 for the child's injury is wholly out of proportion to the culpability on the part of the homeowners and that allowance of recovery would place too unreasonable of a burden on the homeowners.

> And I believe that allowance of recovery under this set of facts would enter a field that has no sensible or just stopping point.

Mackenzie appealed, and we accepted certification of the aforementioned questions from the court of appeals.

54

## III. ANALYSIS

■

¶ 6. Whether public policy acts as a bar to a claim in any given case is a question of law that this court decides de novo. *Rockweit v. Senecal,* 197 Wis. 2d 409, 425, 541 N.W.2d 742 (1995). Mackenzie contends that public policy cannot be used by courts to modify or curtail the effect of a legislative enactment that imposes strict liability because "[t]he ultimate source of public policy in this state is the state legislature." (Appellant's Br. at 8). Mackenzie further contends that courts should not interfere with the legislature's decision regarding the sensible stopping point of the law, and that the legislature, not the judiciary, is the appropriate forum for determining whether a homeowner should be liable under the dog bite statute. Mackenzie principally relies upon two cases in support of this argument: *Borgins v. Falk Co.,* 147 Wis. 327, 133 N.W. 209 (1911), and *Meunier v. Ogurek,* 140 Wis. 2d 782, 412 N.W.2d 155 (Ct. App. 1987).

¶ 7. In *Borgins,* this court decreed:

> Public policy on a given subject is determined either by the constitution itself or by statutes passed within constitutional limitations. In the absence of such constitutional or statutory determination only may the decisions of the courts determine it. . . . When acting within constitutional limitations, the legislature settles and declares the public policy of a state, and not the court.

*Borgins,* 147 Wis. at 351. Similarly, in *Meunier,* when interpreting § 174.02, the court of appeals stated:

> [The statute] unambiguously states the conditions under which a dog owner is liable, we may not add more by implication or statutory construction.

. . . .

. . . [The statute] simply states that the owner *is* liable for damages caused by the dog injuring or causing injury to a person, livestock or property.

*Meunier,* 140 Wis. 2d at 786.

■

¶ 8. American Family responds that *Borgins* is inapposite because the term "public policy" was used in *Borgins* in the context of the broader notion of the state's public policy, whereas the "public policy" as used in the present case refers to the courts' long practice of precluding liability for a tortious act in a particular case based on Wisconsin's view of "cause." For the reasons discussed below, we agree with American Family's argument and hold that courts may use the six traditional public policy factors to bar a claim under § 174.02, even if a plaintiff otherwise establishes liability.

■

¶ 9. Resolution of this issue requires not only an inquiry into the nature of § 174.02, but also an analysis of the history of the six "public policy" factors and their relation to Wisconsin's view of "cause" in tort claims. Our analysis begins with the recognition that § 174.02 is a codified tort action. Also, we note the fact that § 174.02 imposes strict liability on a dog owner for injuries caused by the dog.[4] " 'Strict liability' is a judicial doctrine which relieves a plaintiff from proving specific acts of negligence and protects him from certain de-

_____

[4] *Armstrong v. Milwaukee Mut. Ins. Co.,* 202 Wis. 2d 258, 262, 549 N.W.2d 723 (1996); *Malik v. Am. Family Mut. Ins. Co.,* 2001 WI App 82, ¶¶ 21–23, 27, 243 Wis. 2d 27, 625 N.W.2d 640; *Alwin v. State Farm Fire & Cas. Co.,* 2000 WI App 92, ¶ 1, 234 Wis. 2d 441, 610 N.W.2d 218; *Fifer v. Dix,* 2000 WI App 66, ¶ 7, 234 Wis. 2d 117, 608 N.W.2d 740; *Malone v. Fons,* 217 Wis. 2d

fenses." *Meunier,* 140 Wis. 2d at 785.[5] Thus, § 174.02 obviates the need for a plaintiff to prove specific acts of negligence in each case. However, the statute still requires a plaintiff to establish the other elements common to all negligence claims, causation and damages.[6]

¶ 10. It is with this understanding that we now examine the history behind the application of the six public policy factors used to preclude liability and the relationship between "public policy" and "proximate cause."[7] In Wisconsin, when "public policy" is used in

746, 758, 580 N.W.2d 697 (Ct. App. 1998); *Pattermann v. Pattermann,* 173 Wis. 2d 143, 149, 496 N.W.2d 613 (Ct. App. 1992).

[5] Strict liability is to be contrasted with "absolute liability," a "judicial doctrine which imposes civil liability on proof of a statutory violation, such as violation of child labor laws." *Meunier v. Ogurek,* 140 Wis. 2d 782, 785–86, 412 N.W.2d 155 (Ct. App. 1987).

[6] "[T]he owner of a dog is liable for the full amount of damages caused by the dog injuring or causing injury to a person, domestic animal or property." Wis. Stat. § 174.02(1)(a).

[7] This discussion is not intended as an invitation to reintroduce the term "proximate cause" into Wisconsin's legal lexicon or to alter the current state of Wisconsin's tort jurisprudence. Rather, this discussion represents an accurate historical analysis of Wisconsin's use of the term "proximate cause" in relation to public policy factors. We are simply recognizing that what has previously been labeled as "proximate cause," i.e. the second step in the legal cause analysis, is now referred to as "public policy factors." This concept has not changed; only the label has done so. We emphasize that this opinion does nothing to change Wisconsin's common law relating to duty, breach, and cause in negligence claims. Once it is established that a plaintiff's negligence was a substantial factor in producing an injury, the only limitation on liability is public policy factors— what was previously referred to as "proximate cause." We use

the context of precluding tort liability, the term is being used as a synonym for "proximate cause." *See generally Morden v. Continental A.G.,* 2000 WI 51, ¶ 60, 235 Wis. 2d 325, 611 N.W.2d 659 (discussing the relationship between the terms "causation," "proximate cause," "legal cause," "cause-in-fact," and "public policy"); *Morgan v. Pa. Gen. Ins. Co.,* 87 Wis. 2d 723, 735–38, 275 N.W.2d 660 (1979) (same); Kendall W. Harrison, *Wisconsin's Approach to Proximate Cause,* 73 Wisconsin Lawyer 20 (Feb. 2000)(discussing the historic evolution of the term "proximate cause" and the public policy factors used to limit tort liability).

¶ 11.　Early in Wisconsin jurisprudence, the term "proximate cause" referred to two distinct concepts. The first use of the term was to describe "limitations on liability and on the extent of liability based on [] lack of causal connection in fact." Richard V. Campbell, *Duty, Fault, and Legal Cause,* 1938 Wis. L. Rev. 402, 403. The second use of the term was to describe "limitations on liability and on the extent of liability based on . . . policy factors making it unfair to hold the party [liable]." *Id.* The second use of the term probably had its origins from the venerable Judge Andrews: "What we do mean by the word 'proximate' is that, because of convenience, *of public policy,* of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point. This is not logic. It is practical politics." *Palsgraf v. Long Island R.R. Co.,* 162 N.E. 99, 103 (N.Y. 1928) (Andrews, J., dissenting)(emphasis added).

the terms "proximate cause" and "public policy factors" interchangeably only because, historically, Wisconsin courts have used these terms interchangeably.

¶ 12. The first use and meaning of the term "proximate cause" has long since been abandoned in Wisconsin in favor of the "substantial factor" test used to establish cause-in-fact, which is a jury issue. *Blashaski v. Classified Risk Ins. Corp.*, 48 Wis. 2d 169, 174–75, 179 N.W.2d 924 (1970); *Pfeifer v. Standard Gateway Theater, Inc.*, 262 Wis. 229, 237–38, 55 N.W.2d 29 (1952).[8] However, the second use and meaning of the term "proximate cause" still remains a part of Wisconsin's legal cause analysis.

> The court has acknowledged that legal cause in negligence consists of two parts, the first being cause-in-fact, the second "proximate cause." Regarding the first component, or cause-in-fact, this court has stated that the test is whether the negligence was a "substantial factor" in producing the plaintiff's injury."

---

[8] While it was clear under *Pfeifer v. Standard Gateway Theater, Inc.*, 262 Wis. 229, 238, 55 N.W.2d 29 (1952), that a court could limit tort liability based on public policy, the six factors currently used were first delineated in relation to proximate cause in *Colla*, 1 Wis. 2d at 598–99. Some of these factors were previously used to determine the question of "duty." *Waube v. Warrington*, 216 Wis. 603, 613, 258 N.W. 497 (1935), *abrogated by Klassa v. Milwaukee Gas Light Co.*, 273 Wis. 176, 183–85, 77 N.W.2d 397 (1956). However, Wisconsin has long since followed the minority rationale in *Palsgraf v. Long Island Railroad Co.*, 162 N.E. 99, 103 (N.Y. 1928), which posits that everyone owes a duty of care to the entire world. *A.E. Inv. Corp. v. Link Builders, Inc.*, 62 Wis. 2d 479, 483–84, 214 N.W.2d 764 (1974). In addition to Wisconsin's broad formulation of duty, it is important to note that Wisconsin's substantial factor test for cause-in-fact is equally as broad, as it eliminates the doctrines of superseding and intervening cause. *See Ryan v. Cameron*, 270 Wis. 325, 331, 71 N.W.2d 408 (1955). As noted *infra*, these doctrines are now subsumed in the public policy analysis.

. . . .

. . . "[P]roximate cause," the second component of causation in negligence cases, which is separate from the cause-in-fact determination, may deny recovery. "Proximate cause" involves public policy considerations and is a question of law solely for judicial determination.

*Sanem v. Home Ins. Co.*, 119 Wis. 2d 530, 537–58, 350 N.W.2d 89 (1984) (citations omitted). *See also Morgan*, 87 Wis. 2d at 735 (noting that "[l]egal cause in negligence actions is made up of two components, cause-in-fact and 'proximate cause,' or policy considerations"). "These public policy considerations are an element of legal cause, though not a part of the determination of cause-in-fact." *Id.* at 737.

¶ 13. This relation between public policy factors and the second step in the legal cause analysis is still recognized today.

To discern whether [cause] exists, we must determine whether the defendant's actions were a "cause-in-fact" of the injuries. If they were, we explore whether the conduct of the defendant was a "proximate cause" of the harm sustained by the plaintiff. Proximate cause involves public policy considerations for the court that may preclude the imposition of liability. . . . After the determination of the cause-in-fact of an injury, a court may still deny recovery after addressing policy considerations, or legal cause.

*Morden*, 235 Wis. 2d 325, ¶ 60; *See also Alvarado v. Sersch*, 2003 WI 55, ¶ 42, 262 Wis. 2d 74, 662 N.W.2d 350 (Sykes, J., dissenting) ("What we in Wisconsin refer to as public policy limitations on liability, Judge Andrews catalogued as factors that govern the court's

60

determination of legal or 'proximate cause.' "); *World Wide Prosthetic Supply, Inc. v. Mikulsky*, 2002 WI 26, ¶ 25, 251 Wis. 2d 45, 640 N.W.2d 764 ("tort damages are limited only by the concept of 'proximate cause' or certain public policy considerations."); *Miller v. Wal-Mart Stores, Inc.*, 219 Wis. 2d 250, 261, 580 N.W.2d 233 (1998) (noting that legal cause consists of cause-in-fact and public policy considerations, or "proximate cause"); *Kempfer v. Automated Finishing, Inc.*, 211 Wis. 2d 100, 119, 564 N.W.2d 692 (1997) (" 'In tort actions, the only limitations [on damages] are those of "proximate cause" or public policy considerations.' ") (quoting *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 575, 335 N.W.2d 834 (1983)). Thus, when a court precludes liability based on public policy factors, it is essentially concluding that despite the existence of cause-in-fact, the cause of the plaintiff's injuries is not legally sufficient to allow recovery. Despite the historical origins of the public policy factors in relation to "proximate cause," we note that Wisconsin has largely "[j]ettison[ed] the term 'proximate cause' in favor of 'public policy.' " Kendall W. Harrison, *Wisconsin's Approach to Proximate Cause*, 73 Wisconsin Lawyer 20, 54 (Feb. 2000).

¶ 14. When Wisconsin courts currently speak of "cause," they do so in the context of the substantial factor test for cause-in-fact. Given Wisconsin's broad formulation of duty and causation (cause-in-fact) it is true that "the determination to deny liability is essentially one of public policy rather than of duty or causation," *Rockweit*, 197 Wis. 2d at 425, if "causation" is understood in its current context as referring to "cause-in-fact," or "substantial factor."[9] Thus, this court

---

[9] It is clear that in *Rockweit v. Senecal*, 197 Wis. 2d 409, 425, 541 N.W.2d 742 (1995), we utilized the term "causation," as

has stated: "Even though a jury has found negligence and that such negligence was a 'cause' (or substantial factor) in producing a plaintiff's damages, liability may be denied under factors that we have termed public policy considerations." *Beacon Bowl, Inc. v. Wis. Elec. Power Co.,* 176 Wis. 2d 740, 761, 501 N.W.2d 788 (1993) (parenthetical in original). *See also Bowen v. Lumbermens Mut. Cas. Co.,* 183 Wis. 2d 627, 654, 517 N.W.2d 432 (1994) ("These public policy considerations are an aspect of legal cause, although not a part of the determination of cause-in-fact."); *Rieck v. Med. Protective Co.,* 64 Wis. 2d 514, 517, 219 N.W.2d 242 (1974) (stating "negligence plus an unbroken sequence of events establishing cause-in-fact does not necessarily lead to a determination that a defendant is liable for plaintiff's injuries"); *Alwin,* 234 Wis. 2d 441, ¶ 12 (recognizing that "public policy considerations may preclude liability even where negligence and negligence as a cause-in-fact of injury are present").

¶ 15. However, it is important to recognize and appreciate this relationship between "public policy" and the second step in the legal cause analysis, formerly referred to as "proximate cause." Whether public policy is conceptualized as the second step in the legal cause

---

courts currently do, in reference to "cause-in-fact." *See id.* at 426 (" 'It is recognized by this and other courts that even where the *chain of causation* is complete and direct, recovery against the negligent tort-feasor may sometimes be denied on grounds of public policy . . . .' ") (emphasis added) (quoting *Colla* 1 Wis. 2d at 598–99). Thus, two years *after Rockweit* was decided, this court, in an opinion written by the author of today's decision, declared: " 'In tort actions, *the only limitations [on damages] are those of "proximate cause" or public policy considerations.' "* *Kempfer v. Automated Finishing, Inc.,* 211 Wis. 2d 100, 119, 564 N.W.2d 692 (1997) (quoting *Brockmeyer v. Dun & Bradstreet,* 113 Wis. 2d 561, 575, 335 N.W.2d 834 (1983)) (emphasis added).

analysis,[10] or a fifth step following the duty, breach, cause, damage inquiry,[11] the fact remains that "public policy" is inexorably tied to legal cause in Wisconsin.[12] When we preclude liability based on "public policy

---

[10] *Sanem v. Home Ins. Co.*, 119 Wis. 2d 530, 537–58, 350 N.W.2d 89 (1984); *Morgan v. Pa. Gen. Ins. Co.*, 87 Wis. 2d 723, 735, 275 N.W.2d 660 (1979).

[11] *Hicks v. Nunnery*, 2002 WI App 87, ¶ 86, 253 Wis. 2d 721, 643 N.W.2d 809 (Dykman, J., dissenting).

[12] It is true that the last two public policy factors bear little relation to cause-in-fact. *Hicks*, 253 Wis. 2d 721, ¶ 92 (Dykman, J. dissenting). Yet, this misses the point, as the public policy factors are related to the legal sufficiency of the cause-in-fact. The other four factors directly bear on older judicial doctrines regarding cause-in-fact and duty.

> The court's first public policy factor, "whether the injury is too remote from the negligence," is a restatement of the old chain of causation test. . . .
>
> What this factor does . . . is to revive the "intervening" or "superseding" cause doctrine and dress it in new clothes. . . .
>
> The second factor, "whether the injury is wholly out of proportion to the culpability of the negligent tortfeasor," helps to determine . . . the discrepancy between the degree of negligence and the degree of injury . . . .
>
> The third factor, "whether in retrospect it appears too extraordinary that the negligence should have brought about the harm," is a variant of the reasonable foreseeability test [used previously to determine duty]. . . . Because the court has determined that everyone owes a duty of ordinary care to others, this third factor is necessary to provide some limit for bizarre consequences and unforeseeable plaintiffs.
>
> The fourth factor, "whether allowance of recovery would place an unreasonable burden on the negligent tortfeasor" recognizes that tort law should not seek to deter all conduct that involves risk, just conduct that involves too much risk. Many of the cases in which the public policy factors are necessary involve situations where the actual harm was not reasonably foreseeable.

factors," formerly referred to as "proximate cause," we are simply stating that the cause-in-fact of the injury is legally insufficient to allow recovery. In doing so, we are engaged in judicial line drawing, "endeavor[ing] to make a rule in each case that will be practical and in keeping with the general understanding of mankind." *Palsgraf,* 162 N.E. at 104 (Andrews, J., dissenting). We do so in order to assure that "in cases so extreme that it would shock the conscience of society to impose liability, the courts may step in and hold as a matter of law that there is no liability." *Pfeifer,* 262 Wis. at 238.

¶ 16. Thus, it should be manifest that what we mean by "public policy" as referred to in tort law is completely different than the use of the term in *Borgins.* The legislature's determination of "public policy" in a broader context relates to what is politically appropriate for the state as a whole. When "public policy" is used in this context, it is true that the judiciary is limited to applying the policy the legislature has chosen to enact, and may not impose its own policy choices. *See Columbus Park Hous. Corp. v. City of Kenosha,* 2003 WI 143, ¶ 34, 267 Wis. 2d 59, 671 N.W.2d 633. This stands in stark contrast to the judiciary's use of "public policy," formerly referred to as "proximate cause," which refers to the practice of limiting tort liability as part of the legal cause analysis "on

Kendall W. Harrison, *Wisconsin's Approach to Proximate Cause,* 73 Wisconsin Lawyer 20, 55–56 (Feb. 2000); *See also Morgan,* 87 Wis. 2d at 738 (noting that "[o]ne policy ground for relieving a negligent tortfeasor from liability for conduct which has been a substantial factor in producing injury is the intervening and superseding cause doctrine. . . . The doctrine is another way of saying the negligence is too remote from the injury to impose liability.").

a case-by-case basis." *Beacon Bowl,* 176 Wis. 2d at 763.

¶ 17. While public policy as a limit on liability was conceived in negligence law, the doctrine has grown and progressed to other areas of tort law. Wisconsin has since rendered public policy factors applicable in strict liability tort actions. *See Ransome v. Wis. Elec. Power Co.,* 87 Wis. 2d 605, 625, 275 N.W.2d 641 (1979)(discussing public policy factors in context of strict liability claim but concluding liability should not be denied in that particular case); *Beacon Bowl,* 176 Wis. 2d at 763 (concluding that under *Ransome,* public policy factors could be applied to cut off liability under strict liability action, but that liability should not be denied in that particular case).

¶ 18. In *Physicians Plus Insurance Corp. v. Theresa Mutual Insurance Co.,* 2002 WI 80, ¶ 32, 254 Wis. 2d 77, 646 N.W.2d 777, this court concluded that public policy could be utilized to bar a claim for maintaining a public nuisance. In *Physicians Plus,* the court noted that liability for a public nuisance does not depend upon proof of the plaintiff's lack of ordinary care. *Id.,* ¶ 27. The court then compared liability for failure to abate a public nuisance to violations of the safe place statute and stated that liability for maintaining a public nuisance may arise solely on the basis of notice of a dangerous condition. *Id.,* ¶ 28 & n.24. The court further noted that when all the elements for failure to abate a public nuisance are proven, liability is analogous to negligence per se—failure to act in accordance with statutory minimum duties. *Id.,* ¶ 43. The court then proceeded to apply the public policy factors. *Id.,* ¶ 44. Therefore, *Physicians Plus* supports the proposition that public policy factors may be applied even where the underlying cause of action does not involve proof of specific acts of negligence.

65

██

¶ 19. Moreover, the fact that liability in this case is predicated upon a statute rather than a common-law cause of action is not dispositive, as § 174.02 still sounds in tort; it is a codified cause of action for a civil wrong. This court has in the past noted that public policy may preclude liability based on the safe-place statute, Wis. Stat. § 101.11. *Fondell v. Lucky Stores, Inc.,* 85 Wis. 2d 220, 227 & n.5, 270 N.W.2d 205 (1978). While we are aware that the safe-place statute does not itself create a cause of action, it is the violation of the statute that constitutes negligence. *Krause v. Veterans of Foreign Wars Post No. 6498,* 9 Wis. 2d 547, 552, 101 N.W.2d 645 (1960). Further, in *Fondell,* we noted that "when a safe-place violation has been proven, the law presumes the damage was caused by the failure to perform the safe-place duty [under § 101.11] to maintain the premises as safe as the nature of the place reasonably permits." *Fondell,* 85 Wis. 2d at 230–31. Despite the fact that causation is presumed to flow from the statutory violation, we also stated in *Fondell* that:

> There is no liability upon the failure to meet the required duty until such negligence is found to be the legal cause of the plaintiff's injuries. . . .

> This is not to ignore case law supporting the use of public policy factors in cutting off liability even where negligence and a causal relation have been established.

*Id.* at 227 & n.5. Therefore, even when causation is presumed from the violation of a statute, that cause must still be the legal cause of the injury, such that public policy may act as a bar to recovery.

¶ 20. Similarly, the fact that § 174.02 does not require proof that the plaintiff was negligent, but rather imposes strict liability, does not preclude application of public policy factors. First, while § 174.02 creates a strict liability action, negligence principles are still applicable to § 174.02, as the dog owner's liability is expressly "subject to" the doctrine of comparative negligence under Wis. Stat. § 895.045. Wis. Stat. § 174.02(1)(a).

¶ 21. Also, § 174.02 requires that the dog "cause" the injuries of the plaintiff. "Legislation is presumed to employ terminology consistent with that used by the courts." *State v. Foley,* 153 Wis. 2d 748, 752, 451 N.W.2d 796 (Ct. App. 1989). Under Wis. Stat. § 990.01(1), "technical words and phrases and others that have a peculiar meaning in the law shall be construed according to such meaning." Thus, the legislature, in using and retaining the word "cause" in § 174.02, is presumed to be aware that "cause" in Wisconsin consists both of a factual, cause-in-fact inquiry, and a legal determination as to the sufficiency of that cause-in-fact based on public policy factors. Therefore, even where it is proven that a dog is the cause-in-fact of the plaintiff's injuries under § 174.02, liability may still be denied on the basis of the public policy factors used to determine legal cause.

¶ 22. In addition, the court of appeals has twice indicated that public policy factors may be used to limit liability under § 174.02. In *Becker v. State Farm Mutual Automobile Insurance Co.,* 141 Wis. 2d 804, 807–08, 416 N.W.2d 906 (Ct. App. 1987), the defendant's dog ran into the street, causing damage to the plaintiff's car. The circuit court found that § 174.02 (1983–84) did not

apply to "innocent acts" of a dog. *Id.* at 808. In reversing the circuit court's judgment, the court of appeals noted that the statute was a strict liability statute subject to the defense of contributory negligence. *Id.* at 816. The court of appeals also noted the language from *Meunier, supra,* in rejecting the defendant's argument that the statute did not apply to innocent acts of a dog. *Id.* at 816–17. However, the court of appeals also stated: "we note that the strict liability rule which we recognize in this case is tempered by three considerations: *public policy,* the rules of comparative negligence and the rules of causation." *Id.* at 817 (emphasis added).

¶ 23. At oral argument, much was made of the fact that the applicable statute in *Becker,* Wis. Stat. § 174.02(1)(a) (1983–84), provided that "[t]he owner of a dog *may be* liable," and that the statute was subsequently amended by 1985 Wis. Act 92 to read, as it does currently, that "the owner of a dog *is liable.*" The *Becker* court was cognizant of this change but, after examining the legislative history, determined that "the purpose of the amendment of sec. 174.02, Stats. (1983–84), was to clarify that comparative negligence principles applied to the strict liability provisions of the statute." *Becker,* 141 Wis. 2d at 815. Apparently, while some circuit courts correctly interpreted the "may be" language in § 174.02 (1983–84) as permitting the application of comparative negligence principles, other circuit courts concluded that the statute was not subject to comparative negligence. *Id.* Hence the legislature removed "may be liable" and in its place inserted "is liable," but also specifically made the statute subject to § 895.045, the comparative negligence statute. 1985 Wis. Act 92. Specifically, the *Becker* court found that there was "[n]o other motivating factor for the change in the statutory language . . . ." *Becker,* 141 Wis. 2d at 815. Thus, the fact

68

that the statute currently reads "is liable" does not diminish the significance of the court of appeals' recognition in *Becker* that the public policy factors are applicable to § 174.02.

¶ 24. While *Becker* discussed the applicability of public policy factors, it did not apply them to the facts of the case; thus, the language is arguably dicta. However, in *Alwin,* 234 Wis. 2d 441, ¶¶ 11–14, the court of appeals specifically applied the public policy factors to preclude liability where the plaintiff was injured after tripping over the defendant's sleeping dog. While it is true that the issue of whether the public policy factors *could* be applied to the case was not specifically before the court, the court of appeals' conclusion in *Alwin* that application of those factors prevented liability presupposed that public policy *could* be applied to the statute.

¶ 25. Therefore, Mackenzie's reliance upon *Meunier* is misplaced. As noted above, the court of appeals in *Meunier* stated: "The statute is complete. It permits no additions." *Meunier,* 140 Wis. 2d at 786. However, Mackenzie takes this language entirely out of context. The plaintiff's wife in *Meunier* was riding a farm tractor when she noticed a dog running under the machine. Startled, she popped the clutch and the tractor tipped over, killing her. *Id.* at 785. At issue was whether the applicable statute imposed liability on the dog's owner even in the absence of proof that the dog was mischievous or vicious. *Id.* at 784. Under the previous version of the statute, liability ensued only if the dog was mischievous or vicious. *Id.* at 787 n.4. However, the statute at issue in *Meunier* had since been amended to eliminate the reference to mischievous or vicious dogs. *Id.* Apparently, the circuit court relied on the older version of the statute in granting summary judgment to the defendant. *Id.* at 784. It was in this context that the

above-quoted language was used. The defendant was arguing that despite the change in the statutory language, a dog owner could not be liable unless the dog was mischievous, vicious, or had unusual characteristics. *Id. Meunier* did not discuss the application of public policy factors to § 174.02. Thus, *Meunier* does not stand for the proposition that a court may not use public policy factors to limit liability under § 174.02.

██

¶ 26. Wisconsin courts have at least twice indicated that strict liability under § 174.02 can be tempered by the judiciary. The court of appeals in *Becker* suggested that public policy could be used to cut off liability under the statute, and the court of appeals in *Alwin* actually precluded liability based on public policy. As this court has previously indicated:

> Where a law passed by the legislature has been construed by the courts, legislative acquiescence in or refusal to pass a measure that would defeat the courts' construction is not an equivocal act. The legislature is presumed to know that in absence of its changing the law, the construction put upon it by the courts will remain unchanged[.]

*Zimmerman v. Wis. Elec. Power Co.,* 38 Wis. 2d 626, 633–34, 157 N.W.2d 648 (1968). Thus, "[l]egislative silence with regard to new court-made decisions indicates legislative acquiescence in those decisions." *State v. Olson,* 175 Wis. 2d 628, 641, 498 N.W.2d 661 (1993), *cited in State v. Lindell,* 2001 WI 108, ¶ 155 n.8, 245 Wis. 2d 689, 629 N.W.2d 223 (Abrahamson, C.J., dissenting). The legislature has not in any way indicated that the judiciary is precluded from applying public policy factors to temper the sometimes-harsh results of strict liability under § 174.02. Thus, we hold that Wisconsin courts may utilize the traditional six public policy

factors, formerly referred to as "proximate cause," to limit liability in appropriate cases under § 174.02.

¶ 27. Mackenzie contends that even if public policy factors may be applied to § 174.02, the circuit court should have conducted a trial before applying them. It is true that we have declined to apply the public policy factors if "[t]he factual connections are so attenuated that a full trial should precede this court's determination of policy considerations." *Coffey v. City of Milwaukee,* 74 Wis. 2d 526, 543, 247 N.W.2d 132 (1976). However, a full trial is not always necessary, as "[t]his court can, and has, decided such public policy questions [before a trial]." *Stephenson v. Universal Metrics, Inc.,* 2002 WI 30, ¶ 42, 251 Wis. 2d 171, 641 N.W.2d 158. When the policy questions are fully presented to us and the facts are easily ascertainable, this court can utilize public policy to preclude liability before a trial. *See Alvarado v. Sersch,* 2003 WI 55, ¶ 18, 262 Wis. 2d 74, 662 N.W.2d 350.

¶ 28. Here, the underlying facts are easily ascertainable and are not disputed, as the depositions of Michelle and Nicole are consistent with each other. This case comes to us after a grant of summary judgment, and Mackenzie did not submit any competing summary judgment materials to the circuit court. Michelle admitted that she did not have express permission to enter the Beliunases' home. Further, she admitted that the two usually set up visits in advance and this was the first time she (Michelle) had actually ventured into the inside of the Beliunases' home when they were away. These are the essential facts that are relevant to the application of public policy factors. Further, the parties have fully briefed the relevant public policy factors

71

applicable in this case. As the facts supporting application of public policy factors are easily ascertainable and undisputed and the relevant policy issues have been fully presented, there is no need to conduct a trial before this court can apply those factors.

¶ 29. Having determined that public policy may be used to limit liability under § 174.02, we now turn to address whether the circuit court properly applied those factors to dismiss Mackenzie's claim. This court reviews a circuit court decision to grant summary judgment independently, using the same methodology as the circuit court. *Fuchsgruber v. Custom Accessories, Inc.,* 2001 WI 81, ¶ 9, 244 Wis. 2d 758, 628 N.W.2d 833. The application of public policy factors to a specific set of facts to deny recovery is a question of law that this court decides de novo. *Beacon Bowl,* 176 Wis. 2d at 761. Liability may be denied solely on the basis of one of the factors. *Rieck,* 64 Wis. 2d at 518. In reviewing a grant of summary judgment, this court examines the evidence in the summary judgment materials and reasonable inferences therefrom in a light most favorable to the non-moving party. *Kraemer Bros. Inc. v. U.S. Fire Ins. Co.,* 89 Wis. 2d 555, 566–67, 278 N.W.2d 857 (1979).

¶ 30. The circuit court dismissed Mackenzie's claim on the basis of three of the public policy factors: 1) recovery would be too out of proportion with the culpability of the Beliunases; 2) allowing recovery would place too unreasonable a burden on the homeowners; and 3) allowing recovery would enter a field that has no sensible or just stopping point. Specifically, the circuit court took into account the fact that Michelle and Mackenzie did not have implied consent to enter the Beliunases' home and that Michelle was aware that the Beliunases kept Molly in the house. Finally, the

court commented that requiring the homeowners to do something more than keep their dogs inside with the door shut when the homeowners are away would be too unreasonable.

¶ 31. Mackenzie alleges that these policy factors are not applicable to the case at bar. Mackenzie argues that the first two policy factors relied upon by the circuit court are irrelevant because this is a strict liability action and the negligence or culpability of the tortfeasor is inapposite. She also argues that the third factor does not apply because the legislature has already determined the just and sensible stopping point of the statute.

¶ 32. In rejecting these arguments, we note that the court in *Beacon Bowl,* 176 Wis. 2d at 761–63, determined that the six public policy factors were applicable in strict product liability actions, but did not suggest that certain factors categorically would not apply. Mackenzie's argument that culpability is not a factor is unavailing. While strict liability relieves a plaintiff from proving specific acts of negligence, *Meunier,* 140 Wis. 2d at 785, it does not preclude a court from considering the extent of such negligent activity, if any, in determining whether public policy factors bar the claim. *See Beacon Bowl,* 176 Wis. 2d at 760–66 (considering public policy factors in light of Wisconsin Electric Power Company's negligence in failing to trim trees after the jury found that the electricity it provided was defective and unreasonably dangerous).

¶ 33. Further, the court in *Alwin,* 234 Wis. 2d 441, ¶ 14, denied liability, in part, because "to impose liability under the dog owner statute for injuries arising solely from a sleeping dog would effectively result in a pure penalty for dog ownership." This is synonymous

with saying that allowing recovery would place too unreasonable a burden on the tortfeasor. Finally, Mackenzie's argument as to the third factor is little more than a reiteration of her argument that public policy factors cannot be used to limit liability under a strict liability statute. We conclude that all three factors relied upon by the circuit court are applicable to the case at bar.

¶ 34. Applying these factors to the case, we agree with the circuit court that recovery here would be too out of proportion with the culpability of the Beliunases. Essentially the only thing the Beliunases did "wrong" here was to leave their door unlocked. Nicole testified that, knowing Molly did not like to be around children, she always made a conscious effort to separate Molly from Mackenzie or other children when they were present. We also note that Nicole's uncontroverted testimony establishes that the Beliunases also had another dog, Casey, that Mackenzie would play with by jumping on and pulling his tail and ears.

¶ 35. Further, we agree that liability here would place too unreasonable a burden on the Beliunases. The circuit court indicated that requiring homeowners to do anything more than keep their dogs in the house when the homeowners are away would be unreasonable. We concur with American Family that to allow recovery here would result in clearly unreasonable conse-quences, as dog owners would be forced, prior to leaving their homes, to kennel their dogs, muzzle them, or lock them in cages. We think it unreasonable to force home-owners to keep their homes and dogs under lock and key at all times to avoid liability.

¶ 36. Perhaps the strongest factor weighing against imposing liability is that to do so would enter a field that has no sensible or just stopping point. While we need not determine whether Mackenzie, as a young child, would qualify as a technical trespasser, we do note that it is undisputed that Michelle and Mackenzie did not have express consent to enter the Beliunases' home. The uncontested summary judgment materials submitted by the defendants establish that neither Nicole nor her husband gave permission to Michelle or Mackenzie to enter their home. Michelle admits to this and further admits that she did not call ahead the day the injury occurred to notify the Beliunases that she would be stopping over. Further, even viewing the summary judgment materials in the light most favorable to Mackenzie, there is no evidence, or reasonable inferences therefrom, that support the claim that Michelle and Mackenzie had implied consent to enter the Beliunases' home.[13]

¶ 37. While Mackenzie attempts to characterize Michelle's unauthorized entry into the Beliunases' home as a routine occurrence between friends, the summary judgment materials do not support this con-

---

[13] "[C]onsent may be implied from the conduct of the owner, from the relationship of the parties, or by custom." *Baumgart v. Spierings,* 2 Wis. 2d 289, 293, 86 N.W.2d 413 (1957). Likewise, "consent . . . may be implied from custom, or when the owner's conduct is such as would warrant a reasonable person having knowledge thereof to believe that the owner had given consent to come upon the premises." *Verdoljak v. Mosinee Paper Corp.,* 192 Wis. 2d 235, 243, 531 N.W.2d 341 (Ct. App. 1995). Thus, the landowner's knowledge of another entering his land and his resulting behavior is a key factor in determining implied consent. *See also Baumgart,* 2 Wis. 2d at 294 (finding implied consent where landowner knew children would play on his property and never warned them to leave or stay off of his land).

tention. Michelle stated at her deposition that it was the usual practice for her and Nicole to set up visits in advance, and the two would visit each other's home approximately once a month. Michelle stated that she had stopped by the Beliunases' home unannounced on only three occasions and Michelle could recall only one other time when she entered the Beliunases' home when they were not present. However, Michelle noted that the day the injury occurred was the first time that she actually walked inside the home, as opposed to just standing in the doorway and calling out. Further, Nicole had entered Michelle's home on only one prior occasion when it was vacant, but this incident occurred when the two were in high school and after the two had previously arranged for Nicole to pick up a game. Thus, there is no evidence of a "custom" between the parties of entering each other's homes when they were vacant. The fact that the parties were best friends is not sufficient to establish implied consent.

¶ 38. In addition, the evidence unequivocally demonstrates that the Beliunases did not have any knowledge of Michelle previously entering their home. Nicole stated that she was not aware that Michelle had ever entered their home when they were not present. Further, Nicole was not aware that Michelle would sometimes step inside the doorway to her home and call out to see if the Beliunases were home. These facts are not contradicted by Michelle's testimony. Michelle agreed that the Beliunases did not know that she was coming over the day in question and that she did not have permission to enter their home. Thus, viewing the summary judgment evidence in a light most favorable to Mackenzie, we conclude that the undisputed facts contained in the record support the circuit court's

conclusion that Michelle and Mackenzie did not have actual or implied consent to enter the Beliunases' home.

¶ 39. Were we to allow liability in such a case, liability would enter a field that has no sensible or just stopping point. For example, were we to allow liability here, the door would be open to imposing liability on a homeowner when a burglar enters his or her home and is injured by a dog. While Mackenzie contends that this contingency is better dealt with by the use of comparative negligence principles, public policy would undoubtedly preclude liability even if a putative thief meticulously picked a locked door and gingerly entered the premises, only to unexpectedly encounter a vigilant hound. We conclude that to allow liability in this case, where the plaintiff entered the dog owner's home without express or implied permission, would enter a field that has no sensible or just stopping point.

## IV. SUMMARY

¶ 40. In conclusion, we hold that the six traditional public policy factors the judiciary uses to preclude liability in tort actions are applicable to Wis. Stat. § 174.02. Further, we hold that public policy precludes the imposition of liability under the facts of this case because: 1) recovery would be too out of proportion with the culpability of the homeowners; 2) allowing recovery would place too unreasonable a burden on the homeowners; and 3) allowing recovery would enter a field that has no sensible or just stopping point.

*By the Court.*—The order of the Marathon County Circuit Court is affirmed.

¶ 41. ANN WALSH BRADLEY, J. (*concurring*). The first certified question is whether a court

may use traditional public policy factors to limit liability under Wis. Stat. § 174.02. I agree with the majority that the answer to the inquiry is "yes." Because the majority engages in an expansive discussion, I write separately to focus on two parts of the majority opinion that answer the inquiry.

¶ 42. I focus first on a part of paragraph 22. I agree with the majority that because § 174.02 uses the word "cause" and implicates negligence by providing for a defense of contributory negligence, public policy factors can limit liability here. Majority op., ¶ 22.

¶ 43. As it traces the paths of Wisconsin jurisprudence, the majority explains that "cause" refers to two distinct concepts: cause-in-fact and proximate cause. *Id.,* ¶ 12. It expands the discussion to address the historic evolution of the six public policy factors and their relationship to proximate/legal cause. *Id.,* ¶ 10.

¶ 44. The majority announces that "[w]hether public policy is conceptualized as the second step in the legal cause analysis, or a fifth step following the duty, breach, cause, damage inquiry, the fact remains that 'public policy' is inexorably tied to legal cause in Wisconsin." *Id.,* ¶ 15. Finally, after using the terms "proximate cause" and "public policy" interchangeably, it ultimately concludes that public policy factors can limit liability. *Id.,* ¶ 40. Lest the focus be lost, I emphasize that the answer as I see it lies in the above-referenced part of paragraph 22.

¶ 45. I focus next on footnote 7 of the majority opinion. The majority, at times, uses the terms "proximate cause" and "public policy" interchangeably. This may leave the reader wondering about the continued vitality of using proximate cause to limit liability. Foot-

78

note 7, however, provides the answer. Simply put, in Wisconsin we use public policy factors, not proximate cause, to limit liability.

¶ 46. For the reasons stated above, I respectfully concur.

¶ 47. I am authorized to state that SHIRLEY S. ABRAHAMSON, C.J. joins this concurrence.